## JONES *v.* UNSATISFIED CLAIM AND JUDGMENT FUND BOARD

[No. 237, September Term, 1970.]

*Decided February 10, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, SINGLEY, SMITH and DIGGES, JJ.

*Richard J. Guth* for appellant.

*David J. McDonnell,* with whom were *Allen, Thieblot & Alexander, Francis B. Burch, Attorney General,* and *William E. Brannan, Assistant Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

This is an appeal from the Superior Court of Baltimore City (Sodaro, J.) which did not agree with John Richard Jones that he should have been allowed to bring an action against the Unsatisfied Claim and Judgment Fund Board. Jones still contends that the unusual manner in which he was injured was a "hit and run" accident, as it is defined in the general provisions of Art.

66½, § 7-620 of the Code (1957, 1970 Repl. Vol.), and that he has made "all reasonable efforts," as required by § 7-620 (5), to identify the car and driver that placed him in the hospital for 188 days with a fracture of the mid-shaft of his left femur. We agree with him and shall reverse.

Jones' painful story started with a Friday afternoon nap under a tree in Baltimore's Druid Hill Park on Independence Day, 1969. Asleep on the grass about 15-20 feet from Red Road, he awoke to discover a car driving over his leg. The operator of the automobile, whom Jones described as a five foot seven black man in his mid-thirties, stopped immediately to render aid. After a brief delay, during which Jones recalled him admitting, "I didn't see you," the driver took the appellant to the Maryland General Hospital. Jones remembered the car was a blue Oldsmobile Cutlass with a brown interior. While receiving treatment in the emergency room, Jones saw the driver "moping around in there for quite a while," but, before any one obtained a statement about the accident from the man, he disappeared unnoticed. In response to questions posed both by the court and his own attorney as to why it did not occur to him to get the man's name, address, registration number, or check his operator's permit, Jones testified that during the ride, "It didn't sort of dawn on me then because I was sort of knotted up." A similar excuse was offered for the time spent in the emergency room at the hospital: "Well I was in such pain. I was thinking the hospital would do this." It is unclear when the police were notified but somehow because of the pellmell of this Fourth of July weekend a policeman did not take an accident report until Monday the 7th. Although Jones claims he described the car at this interview, the officer failed to make any note of this on the accident report. Jones' employer put him in touch with an attorney who placed the following ad in the personal column of the Afro-American newspaper on July 12 and 15.

"WITNESS—If you saw car hit man on grass

in Druid Hill Park, July 4, 1969, please call . . . or . . . [telephone numbers]."

Claiming that "it wouldn't have done any good" neither the appellant nor his attorney revisited the scene of the accident but, in a colloquy with the trial court, counsel indicated that he checked with the hospital personnel, examined their files and found no mention of the driver. He pointed out that according to the staff it was normal procedure for them to obtain such information, although the record offers no explanation for their omission. None of these inquiries proved successful.

On the basis of this data the trial court ruled to the following effect:

1. Because there was no evidence of flight from the scene of the accident, this was not a true "hit and run" case.

2. Neither Jones nor his attorney had expended all reasonable efforts to ascertain the identity of the car, its owner, or the driver. This ruling was based on three grounds.

a. Jones did not avail himself of the obvious and ample opportunities to inquire into the driver's identity, or request the hospital to do so.

b. The notice was in a newspaper of limited circulation, and

c. The report to the police was perfunctory and not given soon enough after his arrival at the hospital.

Finally, making an inquiry under § 7-618, Judge Sodaro ruled there was no collusion involved in the claim, although he recognized the great opportunity for defrauding the Fund in this type of case.

While Jones has obviously not questioned this last observation, he has sharply contested the decision on points 1 and 2. Having concluded that both were erroneously decided, we shall first deal with the definition of a "hit and

run" accident and then consider whether all reasonable efforts have been made to identify the malefactor and bring him to justice.

## "Hit and Run"

Two subtitles of the newly renumbered Article 66½ come into play in attempting to define "hit and run." It should be immediately noted that in neither subtitle 7 (Financial Responsibility and Unsatisfied Claim and Judgment Fund) nor subtitle 10 (Accidents and Accident Report) does the term "hit and run" appear as official statutory language. In the controlling statute in this case, § 7-620, the critical term *only appears in quotation marks in the section heading,* a practice which is consistently followed in the two other "hit and run" provisions of subtitle 7, §§ 7-622 and -623. The term does not appear at all in §§ 10-102 through -105, and -109, the sections which attempt to define the criminal aspects of what is commonly described as a "hit and run."

Section 7-620 seeks to isolate the one factor which differentiates a hit and run from other accidents. The words the legislature has chosen to do this make it clear that their concern, at least in terms of compensating innocent victims, is not with flight per se but with the determination that the "identity of the motor vehicle and of the operator and owner thereof cannot be ascertained." It would indeed be a rare exercise of statutory construction to allow a quoted term from a section title to override the clear and precise definitional terminology appearing in the body of the statute.

This identical issue, dealing with a comparable statute, has been before every level of the New York court system and decided adversely to the appellee's suggested interpretation of the law.[1] *Riemenschneider v. Motor Veh. Acc. Indem. Corp.,* 47 Misc. 2d 549, 262 N.Y.S.2d 950 (1965), *aff'd,* 26 A.D.2d 309, 274 N.Y.S.2d 71 (1966) (App. Div. divided 3-2), *aff'd,* 20 N.Y.2d 547, 285

---

1. The Fund does not vigorously press this issue, as its own practice manual, Procedures for Handling Claims under the Maryland Unsatisfied Claim and Judgment Fund Law, 16 (3d ed. 1970), concedes that the term "Hit and Run" is a misnomer.

N.Y.S.2d 593, 232 N.E.2d 630 (1967) (Ct. of App. divided 4-3). In that case the claimant was a passenger in a car struck from the rear at a highway toll booth. Riemenschneider's driver immediately got out of his car, inspected both vehicles, found no damages and asked if the passengers were all right. Upon receiving an affirmative answer to this inquiry he saw no reason to jot down any vehicle information. By the time the claimant arrived at home lower back injury symptoms appeared. The New York uninsured motor vehicle statute in that case used the phrases "whose identity is unascertainable" and "cannot be ascertained" to define accidents where the identity of the offending driver and vehicle remains unknown. The majority opinion in the New York Court of Appeals viewed this language as much more inclusive than the colloquialism "hit and run," noting that the precise terminology in the statute: "encompasses situations where the operator is unidentified and has left the scene of the accident because there was then no reason to identify him, as well as an operator who actually prevents identification by leaving the scene." 285 N.Y.S.2d at 595. While recognizing the strong reluctance expressed in the minority appellate opinions in *Riemenschneider* to apply a general concept of "hit and run" to a situation where there has not been immediate flight from the scene of the accident, we think the reasoning of the majority is much more sound in not placing restrictive definitional burdens on victims of motor vehicle accidents who are unable to identify the offender, whether it be the case of a colloquially technical "hit and run" or a dishonest "Good Samaritan" who renders aid but does not identify himself as required by law. Art. 66½, § 10-104; Luke 10: 30-37.

The claim made under the general provisions of § 7-620 by the injured party that "the identity of the motor vehicle and the operator and owner thereof cannot be ascertained" is basically a statement of fact, not a categorical imperative. It only calls, at the initial stage of the proceedings, for a preliminary determination that the claimant has been injured by an anonymous car. Whether

he has made "all reasonable efforts" to discover the identity of the offending driver, both at the time of the accident and afterwards, is a question to be asked under subsection (5) of § 7-620. In this regard, counsel for the Fund has urged that what Jones has done was neither reasonable nor enough.

## All Reasonable Efforts

Although the verbal expression "cannot be ascertained" merges with the idea that all reasonable efforts must be expended to identify the tortfeasor, we think it is essential that the definition and the investigative condition precedent to recovery are not confused. The fact that the victim "could have made an identification" at the time of the accident, and, with a valid excuse, missed this opportunity, should not prevent him from attempting to locate the tortfeasor as soon as practicable thereafter.

Interpreting a comparable statute, the New York courts have made this distinction clear. If there was a reasonable impediment to identification at the time of the occurrence, the claimant has not been barred from relief, provided he subsequently made every reasonable attempt to identify and locate the offender. The apparent absence of personal injury and property damage; the claimant's disability (*i.e.* unconsciousness, a child of tender years, etc.); misleading acts by the offending driver or confusion with police reports — have all been factors which amounted to reasonable impediments to immediate identification. *Riemenschneider v. Motor Veh. Acc. Indem. Corp., supra; McKay v. Motor Vehicle Accident Indem. Corp.,* 56 Misc. 2d 277, 290 N.Y.S.2d 234 (1968) ; *Petition of Casanova,* 36 Misc. 2d 489, 232 N.Y.S.2d 713 (1962) ; *Darby v. Motor Vehicle Accident Indem. Corp.,* 52 Misc. 2d 1045, 277 N.Y.S.2d 302 (1967) ; *see,* Laufer, *Embattled Victims of the Uninsured,* 19 Buffalo L. Rev. 471, 483 (1970).

The appellee has put great emphasis on the passage of time that elapsed between the occurrence of the injury and the moment the driver left the hospital. He argues

that because Jones was obviously conscious and unusually
alert during this entire period, it should have been in-
stinctive for him to ask the man who he was. The evi-
dence does not support this contention. The victim's in-
juries and the driver's apparent intent to fully comply
with the law concerning his responsibilities after an ac-
cident clearly excuse Jones' oversight.

Looking momentarily at Maryland's penal "hit and
run" statute, Art. 66½, § 10-104, we find that an affirma-
tive duty is placed on the involved driver to render rea-
sonable aid and give his name, address and vehicle reg-
istration number to the victims of the accident as well
as to the police. If requested he is also required to ex-
hibit his driver's license to either of these parties. If po-
lice are not present, and no one is in a condition to re-
ceive it, he must immediately make the same information
known at the nearest police station. It is clear that here
the driver only complied with the duty to render aid.
While Jones may have theoretically had the time and op-
portunity to insist on strict compliance with the statu-
tory requirements, we think it was not entirely unreason-
able for him to assume, in the absence of indications to
the contrary, that since the driver had rendered aid, he
would continue to comply with the law and make the ap-
propriate information known either to his victim, the po-
lice or at least the hospital before departing.

As for Jones' ability to insist that the driver identify
himself, we see no factual support for this contention at
all. The only evidence in the record was that he was in
great pain and that he happened to recall a few general
physical observations. The symptoms of traumatic shock
could conceivably create a situation in which the victim's
acuity of perception is extremely sharp, but we think it
fair to say, in the absence of proof to the contrary, that
after many serious accidents people do not always have
their wits about them. In a pedestrian hit and run case
it would be grotesquely unfair to impose an unbending
duty of instant inquiry on the seriously injured victim.

Before going on to discuss Jones' investigative efforts

beyond this point, two brief observations should be made. The first is that the trial judge's ruling on the question of fraud or collusion required by § 7-618 should not be confused with an evaluation of the sufficiency of the investigation. Secondly, we wish to make it clear that a claimant's failure to make any inquiry at all could be some evidence of fraud, collusion, or a general pattern of indolent or half-hearted inquiry. Judge Sodaro has ruled out collusion, and in view of appellant's injuries, coupled with his lawyer's investigation while Jones was confined in the hospital, we detect no pattern of a lackadaisical attempt to locate a real party defendant.

Counsel for the Fund has nevertheless urged that Jones' post-accident investigation was unreasonable from start to finish. He does not suggest that Jones should have done anything in addition to making a police report, running ads in the paper, or inquiring at the hospital. He only seeks to uphold the trial judge's ruling that the report was delayed and perfunctory while the ad was obscure and unreasonable. At the same time he asks that we not outline a step by step program to insure compliance with the requirements of § 7-620 (5), as to do so would allow claimants to rely on pro forma investigations and thus evade the protective devices set up to safeguard the Fund against fraud and abuse. While we do not propose to stamp our imprimatur on a foolproof checklist for claims in hit and run accidents, we have concluded that Jones and his attorney, given the facts of this case, have done all they reasonably could to ascertain the identity of the Good Samaritan and his automobile.

Dealing preliminarily with the problem of the general standards to be used in making this determination, we do not think that claimants before the Fund ought to be subjected to the labors of Sisyphus in measuring their attempts to exhaust all reasonable efforts to identify and locate an elusive defendant.[2] With the aid of 20-20 hind-

---

2. Sisyphus was the King of Corinth condemned in Hades to perpetually roll a huge rock uphill—and to have it forever roll back again as he neared the top. Hamilton, *Mythology,* p. 298, (Mentor 1942).

sight it is all too easy to say that a particular claimant could have checked on one more clue, run one more advertisement (perhaps on the front page instead of the personal column), or knocked at one more door, until we have reached the point that any claim, especially one that is slightly suspicious, can be thrown out of court no matter how reasonable or thorough the investigation may have been. By this, we do not mean to imply that the standard expressed in § 7-620 (5) is in any way inappropriate for the highly fluctuating and unique factual patterns that will emerge in each hit and run case. On the contrary, the legislature has chosen a useful and flexible tool to preserve the Fund only for claimants who have totally exhausted all other sources of recovery, even though such a general term as "all reasonable efforts" might be subject to arbitrary application. As Professor Fuller has expressed it in *The Morality of Law* (Yale University Press 1966) at page 64:

> "To put a high value on legislative clarity is not to condemn out of hand rules that make legal consequences depend on standards such as 'good faith' and 'due care.' Sometimes the best way to achieve clarity is to take advantage of, and to incorporate into the law, common sense standards of judgment that have grown up in the ordinary life lived outside legislative halls. After all, this is something we inevitably do in using ordinary language itself as a vehicle for conveying legislative intent. Nor can we ever, as Aristotle long ago observed, be more exact than the nature of the subject matter with which we are dealing admits. A specious clarity can be more damaging than an honest open-ended vagueness."

What arouses concern is the statement, to be found in practically all the American and Canadian opinions on the subject, that each case will be decided on its own facts, when it is quite obvious that every hit and run claim is

being partly evaluated against an unarticulated general standard that has been evolving on a case by case basis. To allow case law to refine a general statutory directive is not basically hostile to good jurisprudence, for it is not beyond the legislature's ken to realize that the courts will develop a concept such as "all reasonable efforts" through their experience with it. The process begins with individual cases but general patterns begin to emerge as later cases are compared to earlier ones. There comes a point in time when those patterns become so obvious they can no longer be ignored. When that occurs the courts should be about the business of enunciating principles of sufficient coherence and generality so that people, especially the innocent victims of hit and run accidents, can know and do what is expected of them. *See* Fuller, *The Morality of Law, supra* at 46-49.

In attempting to interpret the principles expressed by the courts, the following comment appeared in 7 A.L.R.3d 851, 854 (1966), an annotation of the cases dealing with the necessity and sufficiency of investigations for uninsured motorist hit and run claims:

"The cases determining what are and what are not sufficient efforts to satisfy the statutory standard of reasonable efforts to identify the tortfeasor do not appear to offer a nice, universally applicable rule as to what efforts are sufficient. Advertising for information about the occurrence, and investigation by the police, professional private investigators, and personal inquiry, have all been advanced, some singly and some in combination with other efforts, as being sufficient to meet the standard, but . . . the reasonableness of any effort or combination of efforts is so dependent upon the circumstances in which the effort is or is not made that it cannot be said that any particular effort is universally sufficient. The determination is generally to be made by the court and, while apparently no

> court will grant access to the fund where a clue
> has not been reasonably followed, each case ap-
> pears to depend upon its own facts."

This is an accurate estimate of the presently articulated case law; it is at the stage of uncertain definition and not of developed and reasoned experience. It is interesting to note, however, that this same annotation uses a much more certain tone in advising attorneys on practice pointers when making a hit and run claim.

> "The lawyer whose client expects to file a
> claim against an unsatisfied claim and judgment
> fund because of injuries caused by an unidenti-
> fied motorist should be sure, before the claim is
> filed, that sufficient efforts have been made to
> identify the driver. Conclusory allegations that
> due and diligent efforts have been made to iden-
> tify him may be insufficient.

> "The lawyer should pursue any information
> which may lead to identifying the driver. Re-
> porting the accident to the police is a common
> method of attempting to identify the driver, and
> a police report indicating that the driver can-
> not be identified may be of considerable weight
> in establishing the claimant's due diligence, pro-
> vided the police were notified *promptly* after the
> accident. Newspaper advertisements are another
> judicially recognized exercise of diligence to
> identify a driver, if they are placed immediately
> after the accident. The use of private investi-
> gators is also advisable in some cases. Of course,
> the failure to identify a motorist after diligent
> efforts is often not alone sufficient to maintain
> a suit against the fund if the motor vehicle it-
> self or its owner can be identified." 7 A.L.R.3d
> 855-56

This is a fair estimate of the unarticulated requirements courts have in fact imposed upon hit and run claimants.

That annotation and later case supplements also contain an exhaustive summary of the American and Canadian cases which have ruled on the sufficiency of investigative efforts. 7 A.L.R.3d 866-67. See *Selimo v. Hartshorn,* 99 N.J.Super. 146, 238 A. 2d 718, 723-26 (1968) ; *Serkes v. Parsekian,* 73 N.J.Super. 344, 179 A. 2d 785 (1962), and Annot., 26 A.L.R.3d 883, 916-18 (1969).

In Maryland there have only been two cases which have construed § 7-620 (5) (formerly § 167 (f)), but they were limited solely to the question of an utterly insufficient investigation.

In *Hickman v. Unsatisfied C & J Fund,* 255 Md. 267, 257 A. 2d 426 (1969) the appellant claimed he was injured when his car was forced off the road by a "phantom" vehicle. He spoke to a police officer at the scene of the accident but made no reference to the other car. It was argued that the seriousness of his injuries excused this oversight, but it clearly did not excuse him from waiting until he got out of the hospital one month later to contact counsel, who then decided that further investigation would be fruitless. We held there that it would have been improper to equate "no effort at all" with "all reasonable efforts."

*Grady v. Unsat. C. & J. Fund Bd.,* 259 Md. 501, 270 A. 2d 482 (1970) followed the reasoning of *Hickman.* The appellant in that case was knocked unconscious when the car in which he was a passenger was forced off the road by a phantom driver. The investigating officer was unable to locate any witnesses or clues at the scene of the accident. He did interview Grady's driver and a fellow passenger but obtained no specific information from them. Because Grady was being treated for two broken vertebrae at the time, no one bothered to obtain a statement from him. At this point the police promptly abandoned their quest for the phantom car.

Grady later left the state without contacting the police or even checking on the progress of their search. Upon suing the fund, he urged that the official investigation, however fruitless or cursory it may have been,

amounted to all reasonable efforts on his behalf, but we did not agree, noting again that neither the claimant himself nor his attorney made any investigative effort at all. In that opinion it was suggested that newspaper advertisements or a door to door canvass of the few homes in the immediate vicinity of the accident would have constituted at least some phase of a reasonable investigation. In a footnote it was observed that a "logical point of inquiry" would have been to check on a call received by the police in which an unknown citizen, who may have been an eyewitness, reported the accident in the first place. The opinion, however, dealt only momentarily on these possible modes of inquiry, stopping pointedly with this observation.

> "At the very least, reasonable efforts in the case at bar would require the appellant to communicate with the State Police to determine whether or not they had even conducted any investigation, and that was not done. In view of the fact that the appellant failed to take even this initial step, we need not decide whether he should have gone further. As in *Hickman,* we are not prepared to accept a total absence of any action by the claimant as 'reasonable efforts.'" 259 Md. at 507

In a word, Hickman and Grady did nothing, but Jones has engaged in investigative activity. We must evaluate his conduct with reference to some general guidelines, although we stress that a checklist approach to these cases may be disappointing, for what may be sufficient in one case could fall short of a reasonable investigation in the factual context of another.

We think it fair to say that, at a minimum, vigorous good faith efforts are required to identify the tortfeasor, the same efforts one would expect an injured party to exert if he knew there would be no recovery unless he actually located the driver. In ruling on investigative efforts the trial judge must exercise discriminating judg-

ment, giving due regard to such variable and interrelated factors as credibility, practicality, the law of diminishing returns, a sensible balancing of the anticipated amount of recovery against the cost of particular modes of inquiry, access to investigative resources, the fresh pursuit of promising clues, and, in the long run, the claimant's application of good common horse sense. In the case before us the trial judge did not take these factors into account, as his decision rested upon an erroneously restrictive definition of a "hit and run" accident and a clearly erroneous interpretation of the facts. Rule 886.

Jones' painful injuries constituted a manifestly reasonable impediment to initial identification as well as to making an instant police report. The appellant claims he notified the police the day following the accident and the only proof contradicting this assertion was the fact that the police could not get around to take Jones' statement until three days after the accident, while he was bedridden. The report that was taken offered no help at all, except to make it clear that it would be unreasonable to expect the police to assist in a metropolitan-wide hunt for a blue Oldsmobile Cutlass. Jones' most logical and promising point of inquiry was to find a witness either at the hospital or among the members of the black community who frequented Druid Hill Park. His attorney, who was contacted promptly, went to work on these clues immediately, inquiring at the hospital and placing two ads in the black community newspaper. *Compare, Serkes v. Parsekian, supra,* 179 A. 2d at 786-87.

As Chief Judge Hammond said for the Court in *Hickman v. Unsatisfied C & J Fund, supra* at 270, and Judge Finan reemphasized in *Grady v. Unsat. C. & J. Fund Bd., supra* at 506, the requirement of § 7-620 (5) *"does not permit the injured person to be the judge of the need to investigate or of the probability of success."* (Emphasis added.) In this case both the appellant and his attorney may well have been convinced of the improbability of suc-

cess, but in spite of this they have made, in our opinion, "all reasonable efforts" to find a needle in a haystack.

> *Order reversed. Permission to*
> *bring an action against the*
> *Unsatisfied Claim and Judg-*
> *ment Fund Board granted.*
> *Costs to be paid by the ap-*
> *pellee.*