## CHERRY *v.* UNSATISFIED CLAIM AND JUDGMENT FUND BOARD

[No. 298, September Term, 1971.]

*Decided March 8, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Herbert J. Hirsch* for appellant.

*E. B. Harris, Jr.,* with whom were *Hardwick & Tripoda, Francis B. Burch, Attorney General,* and *William E. Brannan, Assistant Attorney General,* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

The appellant (Cherry), availing himself of the provisions of Code (1970 Repl. Vol.), Art. 66½, § 7-621, applied to the Superior Court of Baltimore City for permission to bring an action against the Unsatisfied Claim and Judgment Fund Board (Board). This is his appeal from the denial of his application.

Art. 66½, § 7-621 provides in pertinent part as follows:

> "Any qualified person, who, after June 1, 1964, suffers damages resulting from bodily injury or death or damage to property caused by an operator or owner whose whereabouts cannot be ascertained * * * may apply to a court of competent jurisdiction for an order permitting him to bring an action therefor against the Board when the court is satisfied upon hearing of the application, that
>
> * * *
>
> "(3) The applicant has instituted a cause of action against the operator or owner, or both, of the vehicle whose whereabouts cannot be ascertained in order to effect service under the Maryland Rules and service of process in the cause of action has twice been returned non est;
>
> "(4) All reasonable efforts have been made to ascertain the whereabouts of the operator or owners, or both, of the vehicle in order to obtain personal service under the Maryland Rules and he cannot be located, and the applicant will be required to show affirmatively, to the court's satisfaction, that such efforts have been made; and * * *"

Cherry had alleged in his declaration, filed 17 February 1971, that on 4 November 1970 he "was about to alight from his" parked automobile when an automobile owned by Walter Hargrove and operated by Mildred Walker struck his vehicle, damaging it and injuring him. Hargrove was served with process and he thereafter filed a general issue plea. Mildred was returned non est at least twice. Responding to interrogatories Hargrove acknowledged Mildred as an acquaintance but he said he neither knew her address nor anyone who did know it except possibly her brother who was "reported to live at 1433 Milton Avenue," the address which appears on the declaration.

Cherry's application came on for a hearing before the trial judge, Foster, C. J., on 5 October 1971. John La-Martina, a deputy sheriff, testified he made five attempts to serve Mildred at 1433 Milton Avenue. The first and second attempts were unsuccessful; he was told, however, that Mildred had moved to New York. The third, fourth and fifth attempts were equally unsuccessful. He had asked the occupants of 1433 Milton Avenue where she lived in New York but no one knew. It seems Mildred's brother also had decamped. Counsel for Cherry introduced in evidence a piece of certified mail addressed to Mildred at 1433 Milton Avenue which had been returned stamped "Unclaimed" and "Addressee unknown."

Hargrove testified he did not know where Mildred was living. He had seen her but once since the accident and that was about a year after it happened. Cherry said Mildred, who did not have a driver's license, "jumped out and ran" after the collision. Shortly thereafter, he said, the police "picked her up" and gave her "a ticket to appear in Traffic Court." Hargrove appeared; Mildred did not appear and a warrant for her arrest was issued. Cherry said he tried three or four times to find her at 1433 Milton Avenue. The people there told him she had moved to New York. He made no effort to look for her in New York but he "tried to locate her in Baltimore."

While Judge Foster did not state his reasons for denying Cherry's application, it seems likely he thought Cherry had not shown affirmatively, to his satisfaction, that all reasonable efforts had been made to ascertain Mildred's whereabouts. We would have taken a somewhat different view. Moreover we doubt that, in these circumstances, the Legislature ever intended such a stringent application of § 7-621(4).

Despite the sparse record one can scarcely suppress the notion that Mildred seems to have been a rootless young woman, footloose and fancy-free. The deputy's testimony that he went five times to 1433 Milton Avenue is not disputed. That was the only address ever given to him; in fact it is the only address mentioned in the record. Judge Foster seems to have taken a dim view of the fact that he did not ask what "moving company" had moved Mildred to New York. We cannot imagine what led him to expect that a deputy sheriff would ever display such initiative; in any event it is not likely Mildred needed a "moving company" to "move" her to New York, if indeed she went there at all. The police were equally unsuccessful in finding her but, of course, the record is silent in respect of how assiduously they may have pursued her. Cherry's efforts to find her could hardly be called enterprising but, as counsel suggested at argument, he may have been inhibited by the fact it was thought to be unhealthy to be asking too many questions in that neighborhood.

It will be observed that Cherry was reasonably prompt in filing his suit and when it became apparent to him that Mildred had dropped out of sight he served interrogatories on Hargrove. As we have seen, Hargrove's answers were essentially negative.

It seems to us that, with the limited facilities at his disposal, Cherry did show affirmatively that he had made "all reasonable efforts * * * to ascertain the whereabouts" of Mildred. What else Cherry might have done the Board does not say nor do we venture to suggest. We

think it fair to observe, however, that Mildred quite obviously did not want to be found. Only recently, in respect of § 7-620, we said "* * * we do not think that claimants before the Fund ought to be subjected to the labors of Sisyphus in measuring their attempts to exhaust all reasonable efforts to identify and locate an elusive defendant." *Jones v. Unsatisfied Claim and Judgment Fund Board*, 261 Md. 62, 71 (1971).

There remains only the question whether Cherry's showing was "to the court's satisfaction." It will be observed that both §§ 7-620 and 7-621 contain the clause "when the court is satisfied upon the hearing of the application that—." But subsection (4) of § 7-621 contains language which does not appear in § 7-620, i.e., "the applicant will be required to show affirmatively, *to the court's satisfaction*, that such efforts have been made." (Emphasis added.) We think it unlikely that the Legislature, by its choice of the phrase "to the court's satisfaction," intended to impose upon an applicant a greater burden in respect of the "reasonable efforts" required by § 7-621(4) than it did in respect of § 7-620(5) which does not contain that phrase. But if more of a burden was intended, then some thought must be given to what, if any, significance that phrase may have. The word "satisfaction" presupposes the exercise of discretion. If the discretion is personal and absolute, merely a matter of grace, then a showing satisfactory to one trial judge might be deemed utterly inadequate by another, or, as Judge Digges, for the Court, put it, in *Jones, supra*:

> "With the aid of 20-20 hindsight it is all too easy to say that a particular claimant could have checked on one more clue, run one more advertisement (perhaps on the front page instead of the personal column), or knocked at one more door, until we have reached the point that any claim, especially one that is slightly suspicious, can be thrown out of court no matter how reasonable or thorough the investigation may have been." *Id.* at 71-72.

The notion that the Legislature ever contemplated the possibility of such a result must, of course, be rejected. In our judgment the discretion vested in the court by the phrase "to the court's satisfaction" is a sound, judicial discretion and while this discretion is broad it is not beyond appellate review. In *United States v. Hrasky,* 240 Ill. 560, 88 N. E. 1031 (1909), the court said:

> "The city court of East St. Louis has conferred upon it jurisdiction to naturalize aliens as citizens. [Citing cases.] The United States statutes provide that the facts to justify the naturalization of the applicant shall appear to the satisfaction of the court. There is vested, therefore, in that tribunal the discretion to determine whether an alien is fit for admission. But this discretion is not arbitrary. It must be a sound judicial discretion, and if abused is subject to review. [Citing cases.] It must be regulated according to known rules of law, and is a legal and not a personal discretion." 240 Ill. at 563.

We shall overcome here, as did Judge Digges in *Jones,* the temptation to frame a "foolproof checklist" for the use of applicants seeking the permission to sue the Board provided by § 7-621. We do agree, however, that:

> "In ruling on investigative efforts the trial judge must exercise discriminating judgment, giving due regard to such variable and interrelated factors as credibility, practicality, the law of diminishing returns, a sensible balancing of the anticipated amount of recovery against the cost of particular modes of inquiry, access to investigative resources, the fresh pursuit of promising clues, and, in the long run, the claimant's application of good common horse sense." *Id.* at 76-77.

It is a pity Judge Foster did not spell out his reasons

for denying Cherry's application but, had he done so, we think it unlikely he could have said anything which would have had a significant impact on our decision. We do not think Cherry's unchallenged and uncontroverted showing was at odds either with the letter or the spirit of § 7-621(4). It might, to be sure, have been stronger but on this record and in these circumstances it was, in our opinion, sufficient to make the denial of his application an abuse of discretion.

*Order reversed.*

*Case remanded for the passage of an order permitting the appellant to bring an action against the Unsatisfied Claim and Judgment Fund Board.*

*Costs to be paid by the appellee.*